23-12571, In re. BayCare. And let's start with the petitioner. May it please the court. My name is Kevin Johnson. I'm with Johnson Jackson in Tampa, and I represent the petitioners, BayCare Medical Group and St. Joseph's Hospital. As part of BayCare Health System, petitioners participate in a patient safety evaluation system that's specifically designed to improve patient safety. Within that system, we rely on quality coordinators who create referral logs, logging issues as they come in, and quality files that track the process of how they analyze whether those issues present potential patient safety issues that then need to be reported to our patient safety organization. Those logs and files are the primary records that we keep within our PSES to track our analysis and deliberation. They lie at the heart of that system, and they have never been removed from that system. Under those facts, those logs and files should clearly be privileged under the Patient Safety and Quality Improvement Act. And BayCare's privilege claim in the lower court should have been granted, unless Dr. Liu could somehow show that the narrow exception applies. That narrow exception is if those files are necessary to meet external reporting obligations. But Dr. Liu has conceded that Florida's peer review statute did not require BayCare to create or maintain those files. And although we've gone through this entire case with the Florida peer review statute being the primary source of this argued exception, we now have a concession on page 17 of the reply where they concede that BayCare was not specifically required by Florida law to maintain these files. That should be the end of the argument. I'll ask you a question, unpack that a little bit. So one of the confusing elements of this case to me is, does the exception apply if files are required to be maintained by the state, or does it apply only if those files are then reported to the state? Does that make sense? Yeah, it's a great question, Your Honor. And the answer is a little complicated, but essentially what it comes down to is if the files are needed to meet the external reporting obligation. In the ordinary course of events, hospitals are supposed to record certain types of events. We call them code 15 reports, or maybe adverse medical incidents. Those have to be reported externally by statute. And so those are usually kept externally. Now if for some reason a hospital decided that they were going to try to keep those within their patient safety evaluation system and tell the state we're not gonna comply with those reporting obligations, that would be a misuse of the PSES. But what the regulations and the guidance make clear is that within our system, so long as a document is held separately for external reporting purposes, a similar document can be held within the system and can be privileged. It's only when that document that's supposed to be on the outside is no longer there that you can then say, well this was actually necessary to meet the obligation, and this is the only thing that's left, and so now it must be excluded from the privilege. So you just hit two exceptions. So there's the one exception that says collected, maintained, or developed separately, or exists separately. So you would agree that if these documents didn't exist within this reporting system, they're not covered by the privilege, just by the fact that they exist somewhere else. So not necessarily, Your Honor, and the distinction is this. If we make a Code 15 report to the state, to the Agency for Healthcare Administration, that exists outside the system, and it's not privileged. You could have a very similar document that exists, says the same thing, contains much of the same analysis, lives within the system, that would still be privileged, because it's used to report to the PSO. So the question is whether it's necessary for external reporting. So then that forces us to look to whether there's an external reporting obligation, and the Florida Peer Review Statute is very clear that there are only two types of documents that we are required to maintain specifically, and those are agendas and minutes, and were directed under the Florida Statute to keep those without confidential information. Petitioners say that it doesn't matter that there's no specific external reporting obligation that names quality files or referral logs. They say just because there's a general duty to conduct a peer review, we should then somehow be required to also produce any document that constitutes a peer review to the state, or to make it available, because it's somehow needed for an external report. What's missing is any specific... Council, let me ask a question related to that, and to opposing council's argument on that. In looking at 42 USC section 299B-217A, there are three ways that this information can be protected, and you're traveling under the, which identify or constitute the deliberations or analysis of, or identify the fact of, reporting pursuant to a patient safety evaluation system, correct? That's correct, your honor. So let's pretend there's a state in which there are no reporting requirements. Could, in that situation, could a hospital put everything in this patient safety evaluation system? Could it put all of its HR records? Could it otherwise bury all other records in it, and thus shield all of those documents from any sort of discovery and litigation? No, your honor, because there's another part to that clarification or exclusion, which says that the original records that are created outside the system, those can't be placed into the system and treated as privileged. So all the original patient records, original billing records, original HR records, those all live outside the system. They are not brought into it. They are not sifted through to analyze whether there's a patient safety issue. Where does that come from? I'm sorry, I'm just... So that's in the exclusion to 299B21, and it talks specifically about a patient's original medical records, billing, and discharge information, or any other original patient or provider record. It's 299B217B. So what happens here is the proposed approach by respondents is to say, because there's a peer review statute, then just ipso facto, anytime there's peer review, those documents cannot be privileged. The problem with that is that to do quality analysis, we depend on the information and the assessment of experts, namely doctors. Well, doctors are gonna be peers, and if they are reviewing a quality safety issue, it's pretty easy for my opponent to get up and say, well, that's peer review because they're reviewing a quality issue. And so if that's what is meant by peer review, and just the ability to say, hey, a doctor reviewed an issue, then takes everything outside this privilege, then we've eviscerated the privilege. There's nothing left. Because if it's that broad, our choice as a healthcare system is either to proceed without asking doctors to provide their reasoned judgment as to whether something's an issue, or to just accept that none of this is going to be privileged. And then we're not going to be able to get the doctors to give us their opinions. But that wasn't the full purpose of the statute. The statute, from my reading, is really about protecting doctors from malpractice suits based on that information. But in this case, you have someone who's brought an employment discrimination case, which under her theory requires her to present comparators, and the only information available for her to satisfy that particular burden, you possess and yet want to cloak under privilege. How does that not undermine, or at least not advance, the real purpose of this privilege statute? Well, I think the first thing to remember is the privilege protects records, not facts. She's free to discover the underlying facts, okay? She can do that through other records like disciplinary records, employment records, testimony from those that were involved with the processes. So that's very important, because that's the whole point that Upjohn made, is that this is a privilege that protects communications or records, not facts. So she can still ask for all those things in discovery and she can prove her case. As I understand it, her case revolves highly around how other doctors treated her on site, almost like a harassment type of allegation. And the answers to that are not gonna be found in peer review files, okay? Much less within the quality files that we're talking about here. So I think that's a very important problem that the court needs to consider. The other important point that I really need to make is that the impact of this on doctors' willingness to cooperate cannot be overstated, because doctors need what I would call predictive certainty. They need to be able to predict that when they give their honest opinion about a peer, which can be a very uncomfortable thing to do, that that is going to stay privileged. And if we're going to now create a system that has such a loose definition and is going to come down every time to district court having to sit through and conduct an in-camera review, and none of us can predict on the front end how that's going to come out, we've lost predictive certainty. The Supreme Court has said that's really important when you're talking about privileges. They said that in Upjohn, an uncertain privilege or one which purports to be certain but results in widely varying applications by the courts is little better than no privilege at all. And I think another point I want to make is that there's been some discussion about whether the mere fact that there's a confidentiality protective order in place in this case is enough to somehow allay our concerns about the privilege. And the answer to that is no, it's not, because the mere existence of a protective order does not address the reason for the privilege. We don't, in looking at the attorney-client privilege, for example, say, well, counsel, just go ahead and produce your notes of your attorney-client protected conversations to opposing counsel for his review, but I'll make sure they're covered by a protective order so nobody in the outside world gets to see them. The whole point is that the privilege is supposed to protect this information from our opponent, okay, from those who would see it. And when the doctors are looking at this, trying to think, should I give my honest opinion about that surgery conducted by my peer? They're going to be concerned if it's then going to end up in the hands of the peer whose lawyer is going to then interrogate them about it and accuse them of all sorts of nefarious activity when it comes to giving that honest opinion. Let me ask you a question. Counsel. Go ahead, Judge Branch. Oh, counsel, I think in your petition, you mentioned that the hospital keeps the minutes of the peer review committee meetings as well as the agendas from the meetings separately, and I guess shares those with the state. Assuming I'm correct in remembering that, that information would be available to her, correct? Yes, absolutely. And so can you tell me just a little bit about in the minutes of the peer review committee meetings, would that give her enough information to then depose decision makers? I mean, she would know who was being reviewed, right? She would know other doctors, other comparators' names, right? Yes, the minutes would identify the doctor that was under review, okay? But the interesting thing in this case is that the 10 comparators she's identified, none of them have records with the peer review committee because none of them were brought up for review. So to the extent she's saying I'm concerned about how the peer review committee treated me, well, the peer review committee can only act on the cases that are brought to it. So if other people didn't bring these cases up, are we now saying that I get to get discovery of how other people failed to do something they should have done, even though they're not the alleged discriminator? Because that's very far away from helping someone prove their discrimination case. Can I ask you a question about, do you represent hospitals on a regular basis? Yes, Your Honor. Well, so in this case, and I guess sort of other cases, what patient safety evaluation system, the statute defines that in sort of a fairly broad way, collection management or analysis of information for reporting to a patient safety organization. Like what does that mean as a practical matter, like within a hospital? How does that work? As a practical matter, it involves the flow of information between various committees that need to review it and then determine whether it is something that needs to be reported to the patient safety organization. The regulations provided by HHS give hospitals great flexibility in defining it for themselves. In Baker's case, there are several different components. There's one that deals with the customer end of it. There's another that deals with quality reports and things coming in from clinicians. There's another that deals with clinical risk. And yet another part that deals with risk management, which is outside the system. So all of these, if I draw you the diagram, it's gonna look something like this, okay? It's gonna have a lot of arrows going back and forth between various committees. But we need the flexibility to be able to design that in a way that we can fix the problem. One issue that I see come from the other side is, given the sort of vagary, which you could say this is a patient safety evaluation system, how do we go about defining that in a way where the hospital can't just say basically all of their documents are part of the patient evaluation system? I think you're limited to what Congress and HHS have supplied. And they have said it needs to be very flexible. But they expect the hospital to document it. So if the hospital has documented it, and here I don't think there's any doubt that these are at the heart of the PSES. These are quality files and referral logs that are the very people who are sending them for review and trying to figure out where it's going. Any other questions, Judge Branch? Just for my own clarification, because my understanding from the district court's order is that the court found that these documents were, it wasn't just a sole purpose, it had a dual purpose or many purposes. So if indeed there are many reasons for why the document is initially created and then it might enter into the land of privilege, what relevance does the initial intent behind its creation have when it comes to evaluating the claim? Again, if we say a narrow employment discrimination claim requiring evidence of comparators, what does it matter that it ended up including some privileged information? It's a really important question, Your Honor. I think it probably has two parts to the answer. The first one is that it should not matter whether something is used for other purposes within the system, because HHS is very clear about that. They say, as explained, uses of patient safety work product within a legal entity are not regulated, thus patient safety work product may be used within an entity for any purpose. And that's because otherwise we would have to build these side-by-side duplicative systems, which would be a huge amount of wasted effort. And so I think because of that, if it's in there and it's done as part of our analysis in a patient safety evaluation system, it should be treated as privileged. And courts really, I think hospitals know what's patient safety evaluation system. I don't think courts have much trouble in figuring out when something is outside of that or was created not within the patient safety evaluation system. But that's not really an issue here. And so I think that's why the argument there somehow is a dual purpose or a single purpose rule is so outside what the statute requires. Because if you use that nomenclature, you're basically saying any time I can divine that there might be some other use for this within the system, it loses its privilege. But HHS has said that doesn't matter. There's no indication that Congress thought that should matter. All right, thank you very much. We'll hear from the respondent. May it please the court. My name is John Goldsmith and with my partner, Lindsay Lopez, we represent the respondent, Dr. Tara Liu. In Atkins, this court held that a peer review privilege does not apply in federal civil rights. In federal civil rights cases, because the discrimination occurs within the peer review process itself. All other circuit courts which have addressed this issue concur with Atkins. Atkins held that the important federal policy of rooting out discrimination in the workplace is more important than protecting the medical peer review, which is the argument that you just heard from Mr. Johnson. Now the- But counsel, Atkins didn't deal with the patient safety and quality improvement act at all, did it? It did not mention it at all. It was two years after it was passed, but it did not mention PSQA at all. But what petitioners have done is since Atkins was decided, the petitioners have created a system where they have placed all peer review in a system it calls RLDatex, claiming that it is patient safety work product. Only if the petitioners decide to drop out peer review of a specific physician, do petitioners assert the PSQIA privilege does not apply. So Dr. Liu requested the peer review files of 17 physicians, and they produced the peer review file of one, Dr. Liu, because they said Dr. Liu's peer review file, they decided to drop out, and they decided not to drop out the peer review file of the other 16 physicians that were decided. That were involved. Do you have minutes related to the other physicians, minutes of peer review committee meetings? No, the answer is that as often happens in discrimination cases, Judge Branch, the discrimination oftentimes occurs in peer review, but before it gets to the peer review committee. So incidents involving awful, terrible circumstances that we understand have occurred at this hospital never made it to peer review, because instead they ask a physician to take a weekend course, or they told the physician be careful next time. And so it never actually got to peer review. So the peer review minutes don't help us when it never actually got to that process. And so that's the problem we have, is that, and this is what the- I'm confused by that. If the peer review minutes don't show anything about this, then what documents do you think exist? What are the documents that we're talking about? So what happens typically in a peer review, Your Honor, is that there is a complaint or an issue that arises. It might be that a patient returned to the operating room within 48 hours. It may be physicians that have high rates of infection. It could be a specific medical incident that occurred that raised a concern. And then that's reviewed internally by a physician. It may be the department chair. It may be somebody, the chair of the peer review committee. It could be a number of other people. But only if they refer it to the peer review committee is that going to occur. And in this case with Dr. Liu, what happened is, is there was no referral to a peer review committee. But after Dr. Liu had complained about gender discrimination and had raised issues with regard to her job as a pediatric trauma director at the hospital was not providing sufficient resources. And then she resigned from that position given 60 days notice. After that, they then went and they reviewed all of her complications that she had had over the last three years, none of which ever gave rise to a peer review issue. And they then took that information and this was done by BayCare Medical Group. And that was then supplied to St. Joseph's Hospital which are both owned by the same people, BayCare Health. And that was the basis of the peer review. Yet we have circumstances much worse than this that we believe occurred with regard to other physicians that never made it through the process. But we, and that's, we believe in that system. And we believe that Judge Jung saw that in the system when he reviewed the quality, the peer review files for those 16 individuals. He defined the files that he looked at as saying each camera that was produced for in, each item that was produced for in-camera ex parte review is labeled at the top peer review. One column called review type is often populated peer review. Action columns look like peer review. Nothing visible refers to a PSO or indicates that the items are sent to a PSO. Action items like refer to committee, track and trend, focused review, or physician counseling suggests a dual purpose of this data. It is not the PSO committee that is referred to. The PSO does not counsel the physician subject to counseling. The local quality department does the track and trend, not the PSO. PSO, with regard to the files that he reviewed in the in-camera review, he doesn't think have anything to do with the PSO at all. They have to do a peer review, yet they stored them there to protect them from review that this court in Atkins said that we're entitled to get. The court also said, and this is- They're only trying to get the quality files and the referral logs, correct? Well, there's quality files and referral files, which include the peer review of each of these physicians that was done. And so- So within those two categories, that's where the peer review information lies. Well, Your Honor, it's difficult for us to tell because we haven't seen the documents, but Judge Jung's review of the documents suggests that there is much more than those two categories of documents that are in the peer review, if you look at what I just read, which is a docket 112 at page three. And the district court also said that what they claim is PSES is not maintained as strictly confidential, but instead is utilized throughout multiple departments and committees of the hospital for multiple different purposes, including peer review, risk management, root cause analysis. And the one thing that Judge Jung says in this part of the order is he doesn't see that it refers to PSO at all. And what's important is there is no evidence and they do not contend that any of these peer review files were ever sent to a PSO, were ever sent to a patient safety organization. Yeah, I mean, there are three definitions of privilege. The first one is sent to a PSO. The second one is developed by the PSO and they're going under the third one, which is identify the deliberations or analysis of a patient safety evaluation system. I mean, why couldn't peer review documents identify the deliberations or analysis of a patient safety evaluation system? Because if they are placing all peer review, which we know they've done. Yeah, let's just assume they're doing that. They're putting all peer review that Atkins has said that plaintiffs in discrimination cases are entitled to get, they're putting it into what they call the RL Datrix system and they claim it's part of their analysis and review. And that as a result of that, it's completely privileged. But I think Judge Jung's review of the documents in camera and they did not provide that in camera to this court to review. We didn't have the ability to do that. We'll probably ask for that. But I do think that that's important that the judge did have the ability to actually look at and review those documents. Yeah, but so if I understand their argument correctly and I want to address this. I mean, so the district court said these documents weren't created for the sole purpose of deliberations or analysis of a patient safety evaluation system. And on that basis said, therefore they are not privileged. What is the reasoning behind that sole purpose exception, I guess, or definition? Yeah, that's a good question. And both of the Florida Supreme Court in the Charles versus Southern Baptist case, the Kentucky Supreme Court, the Dunn District Court in Alabama have all held that if there is a dual purpose for the maintenance and creation of the documents, then it's not protected by the PSQIA privilege. And here, Florida law actually does specifically require that peer review be performed. And I guess here's the, I mean, I get that the Florida Supreme Court has held that and the Kentucky Supreme Court has, but I'm trying to figure out where does that come from? Like, what is it in the statute because you, I mean, the statute could be written to say the sole purpose of these documents is to identify the deliberations or analysis. It doesn't say that. And it makes sense to me that that would be the privilege, that it would be for the sole purpose, but I'm trying to figure out a way to say that the statute creates that. Well, I mean, I think the regulations say that patient safety work product does not include information that is collected, maintained, or developed separately, or exists separately from a patient safety evaluation system. Such separate information or copy thereof reported by a PSO shall not be a reason for its reporting to be considered patient safety work product. And in this case, Florida Statute 395.01932 says that each licensed facility as a conditional licensure shall provide for peer review of physicians who deliver healthcare services at the facility and each licensed facility shall develop written binding procedures by which such peer review shall be conducted. And the hospital has written peer review procedures that require them to have written peer review of the physicians. So there is- But the statute, but you would concede that the Florida statute does not require the maintenance of any peer review documents or the creation of any reports to be provided to Florida, right? Well, right. There's no requirement to be provided to Florida, but they do require that peer review be done. And in fact, they do peer review and they do put it in writing. And not only do they put it in writing, you can't do peer review if it's not in writing. You can't do peer- The Florida statute requires that its procedures be in writing. That's it. It doesn't speak to any of the documentation required in the peer review process, correct? Well, the statute says that they shall provide for peer review. And if they are providing for peer review, if they're providing for peer review, peer review cannot be done orally. Peer review has to be done in writing. You're not gonna say, you know, I remember Dr. Smith three months ago, I think had a similar problem. What happened? And of course, that's what Judge Jung is saying. We actually went back and he looked at the records and that's what they're doing. They're looking at each of the incidents of these physicians, the situation they had in the past, and you have to have in writing. You cannot do peer review if it's not in writing. And the Joint Commission, which accredits this hospital and is the basis for them to get Medicare patients, also requires that they do it in writing. It's the only way you can do peer review. Let me also ask you, you're citing to Charles and the Florida Supreme Court, but that case says the information that is usually contained in state mandated reports is not protected by the patient safety work product privilege provided in the Federal Act. Here, you would conceive we do not have state mandated reports, right? We do not have state mandated reports like Amendment 7 in Florida. That's correct, Your Honor. Okay. That's right. But what we do have is a statute that requires peer review to be performed, and that peer review is required as a condition of its licensure. And I think that one of the important points is that, and I think the point that you made, Judge Branch, which is what prevents them from putting all HR records, all other records of the hospital into what they call patient safety work product. And the answer is, under their definition, nothing. And that's what they've done here. Because after Atkins, they decided they were gonna put all peer review in here, which does prevent us from getting that information. Which means that there's some documents, arguably, that are privileged and then some that aren't. And the only concern I have with the district court's order is that he gave you everything as opposed to perhaps redacting or excising some of the information that might indeed be privileged. I mean, so it seems like you're entitled to some, but not everything. And Your Honor, without looking at the documents, we don't know. The judge is the one that did the in-camera review, and that was the determination that he made. It is possible that there could be things that are subject to privilege, but what is reported to a PSO? What's reported to a PSO are things like, how many surgeries are, where somebody returns to surgery within 48 hours? What's the infection rate? How many times are there a code 15 or some other type of event? That's the type of stuff that is reported, not what's here, which are kind of routine type issues that occur in peer review, but yet they put everything. Well, but so, can I just press you on the point about the financial documents and HR documents and stuff like that, kind of hiding those in the system? I mean, it seems like that might be a little bit overblown of a concern because the statute here does say that the documents have to identify the deliberations or analysis of the system, right? So it has to be some kind of, there has to be some kind of deliberation or analysis going on in the document to be protected. Right, and the deliberation and analysis, for example, could be of an employee, a nurse, a custodian, and saying, oh, well, this created a patient issue, and that could be sufficient. And I think that Judge Abudu makes a good point, and that is that if you, and again, we haven't seen the documents, but if you look at the documents, that may actually allow us to make a determination of whether they are peer review or protected for PSO. Because deliberations, is it a deliberation to have the chairman of the surgery department look at an adverse incident that happened with a physician, and then go and talk to the doctor and say, hey, be careful next time? But then with our client, they decide to refer it to peer review and kick her off the staff. Yeah, so I mean, one, let me just see what you think about this. I mean, one conceivable outcome of this mandamus petition would be for us to say, look, district court, you applied this sole purpose, dual purpose analysis. There is nothing in the statute about that. What you should have done is just looked at the documents and asked whether they identified the deliberation or analysis of a patient safety evaluation system, and just answered that question. What do you say about that? Well, I do think that that is reasonable, but I think the other thing the court should look at, as the court in Dunn said, is whether the information was developed for the purpose of reporting to a PSO. Because if it doesn't, then it's not protected by the PSQIA privilege. So I think it has to be developed for the purpose of reporting to a PSO. The mere fact that there's some deliberation involved doesn't mean that it's protected by. What does that mean? And this will be my last question. What does that mean for the purpose of reporting? Because couldn't you have a situation where, let's just assume everything is completely above board, the hospital's not trying to hide anything, right? But there's a report of some adverse health event, and then as part of the patient safety evaluation system, that goes to some committee, and they review it, and they say, oh, this is actually not the kind of thing we need to report to the PSO, so thanks for coming, but this is not that important. Wouldn't that still be privileged as deliberations? Yeah, Your Honor, I think you're right. If it is reviewed for the purpose of, is it something that would be, should we send it to a PSO? I think you're right. But if you're looking at a physician who operated on the wrong side, or amputated the wrong foot, and you go and talk to that physician, that may not be something you would ever report to a PSO, because it's a one-time incident, as opposed to what they're looking at the PSQIA, the PSQIA is they're looking for reports of trends, and infections, the number of wrong side surgeries, the number of return to surgeries within 48 hours, things of that nature, not a one incident type of situation, which oftentimes happens in peer review, because peer review involves a specific physician, as opposed to what's being reported for PSO, is looking at what is the overall arch of what's happening with healthcare at this facility, not looking at individual facilities, but do we have a facility that's having high infection rates, high return rates of surgery, things of that nature, not ones that involve specific referrals of physicians. Does anybody else have a- Counsel, you seem to still be going back to the first category of patient safety work product, when you keep saying that might not be reported to a patient safety organization, but we have been talking about whether this constitutes the deliberations pursuant to the patient safety evaluation system, so I guess I'm concerned when you answer Judge Brasher's question that's directed more at the third one, and you're still talking about the first one, I worry that we're kind of talking crosswise. Yeah, and Judge Branch, I appreciate that, because my intent was I agree with Judge Branch, that if you look at the document and you determine that it is, that the purpose of it was for deliberations, is this something that we should consider reporting to a PSO, then I agree that's something that would be protected under the PSQIA, but my point was to say is that if you have an individual incident where one physician operates on the wrong site, that's never gonna be something that is going to be part of a PSO deliberation. What's part of a PSO deliberation is going to be trends of the hospital overall, of wrong side surgeries, of returns to the operating room within 48 hours, infections, things of that nature, not the actions of the individual physician. Don't you have to gather the individual incidents in the patient safety evaluation system before you can start seeing trends? So if even one incident of operating on the wrong side might not be reported under the first one to the patient safety organization, you now have a broader thing, the patient safety evaluation system, you're gonna collect all of those. Yes, that's correct, but that doesn't mean that the individual situation is ever going to be reported. They're simply collecting, here's one case of wrong side surgery, and what is the average for a hospital of this size with the number of surgeries they have to have wrong side surgeries? If the average, let's say, is four a month, and you have 14, that's a concern, that's reportable, but the specific instance and circumstances involving a particular physician operating and removing a left toe instead of, on the right foot instead of the left toe on the right foot, that's the kind of specificity, is not the type of thing that patient safety organization's looking at. They're looking at the overall trends, but I agree, the information is going to be derived from the specific peer review file of the individual, but that's it. It's only a statistical gathering of information. You brought an employment discrimination case, but Mr. Johnson has defined the scope of your claim as not requiring evidence regarding comparators and that there are other means through which you can receive this evidence, including deposing the 10 doctors that Dr. Liu identified. What is your response to that? Thank you for that question. The answer is that we did raise a number of examples of comments and statements and treatment by her, but we're also alleging very specifically in the complaint that Dr. Liu is being treated differently than similarly situated individuals, and we cite that in a number of different places in the paragraphs of the complaint. And number two, yeah, we could take somebody, we could take the chairman of the peer review department, and the chairman says, well, gee, I remember four or five years ago, I don't know, I'm not sure. I think there might've been, I don't remember. The problem is if you don't have any documents, how can you cross-examine a witness like that? It allows them to have a foggy memory and not to have their memory refreshed. Documents are the key in any employment discrimination case and having the recollection of somebody who is a practicing physician and who has a voluntary position in the peer review or a medical executive committee or chairman of a department, try to remember what happened years ago is not the way that a jury should be deciding a discrimination case. Anything else, Judge Brash? No? All right, thank you. Thank you, Your Honor. All right, we'll hear again from the petitioner. Your Honor, I think to crystallize, we have to just imagine the situation in which a surgeon is reported to have made a very serious error and operated on the wrong site within a child or connected the bowel to a portion of the bowel that it shouldn't be connected to, which is essentially what we're talking about here. Somewhere, review needs to take place of that, okay? And we're going to have to have other doctors sit down and look at the results of that surgery. What is the purpose of that? Are we doing that for patient safety because we want to prevent it from ever happening again? Or are we doing it because of peer review to figure out if we have a dangerous doctor who needs to be removed from the system? Those two purposes are just inextricably intertwined at that point. So to say that we can somehow have a single-purpose or a dual-purpose test where all I have to do is come in and encant the words peer review, and all of a sudden that takes it out of the obvious patient safety review that was going on, that's unworkable. There's no way a doctor will be able to feel comfortable believing that his review of that situation is privileged under PSCLA. So that's a real important problem here, okay? And we just have to take account of that. And I think it's so clear under the HHS guidelines that they anticipate that hospitals will need to have flexibility, and that they don't need to be forced to run one system for patient safety, and then a fully duplicative system for peer review, discipline, risk management, and everything else. There's a specific comment that we cited and that's in the preamble to the rules where someone asks, can we use it for other purposes within the system? And HHS was very clear, yes, there are no limits on the number of uses within the system. So because of that, I think it's very clear that you can't have a test that focuses solely on how information is used. Another point that I think it's important because you mentioned that you might want to look at these documents. Fun fact, RLDatix is a vendor, or it's a system provided by a vendor. The vendor sets that system up with specific modules. One of the modules that's used by the quality department happens to be called peer review. It's not a Baycare choice, that's a vendor choice. So if Judge Jung is looking at a document and sees peer review on the top of that document solely because that's what the vendor calls that module of the system, and that's what it's printing out of, what significance does that have in the big picture? How does that mean that we should lose the privilege just because of that artifact? Can I ask you to define, so what do you think, so I think I understand the respondent's definition of this term, identify or constitute the deliberations or analysis of. What does that mean to you? How should we interpret that? I mean, he seems like he's suggesting identify or constitute the deliberations or analysis. You're deliberating or analyzing whether you should make a report. I think that's his position. I think, take those two terms and give them their normal everyday meeting. Identify would mean we're identifying what happened. We're tracking the steps that took place. Or constitute the deliberations or analysis. That's when we're actually doing the analysis or the deliberation. But I think if you say we're only going to protect analysis, we're not also gonna protect the identification of the steps that took place, well, that's so critical to what we do. When we're sifting through all this information in a complex system, trying to pull the signal out of the noise, sometimes the only way you find that signal is you have records of what happened before. And you can say, well, isn't this the fourth time we've had this incident come up from this doctor? Isn't that what the data shows? And if we can't protect the identification of that data and that kind of tracking, we're not gonna be able to protect how we find those issues. So are you saying that all of the information and underlying documents that lead to the deliberation and analysis should be protected as well? That is your position? The distinction being that the original patient records are not protected. But obviously what this PSQIA is designed to do is to create a system where we call information and we report it to a PSO, the stuff that needs to be reported. The concern HHS identified is if it depends solely on reporting in prong one, everybody's gonna flood the PSOs with all of the noise. So we should encourage them to separate the signal from the noise and then report the signal because that's much more efficient. To do that, we need the second prong. We need to say that all of your efforts to call through the noise and come out with the signal, that's protected. So not the original patient records themselves, but when somebody reports as a customer, I felt like the doctor was very rough with my son, or when you have a clinician that says, Dr. Liu was very rough with her patients and I've never seen a pediatric surgeon be that rough with a child, those types of things are now reports. They come in. That's what we have to decide is, is that something that's serious enough to report to a PSO? And so we have different levels and those are identified in Amy Valerio's affidavit where she specifically identifies the different levels of things like focused review or track and trend. As you get more concerned that there is a serious issue, you get more and more into that. At some point, you're going to say, let's send this over to clinical risk, let's make this report to the PSO because this is something that falls within the category that the PSO needs to know about. All right. Thank you very much. Take this under advisement. I will say you should probably be thinking about a way to file these for our in-camera review. So with that, I will be adjourned.